**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABBY BUCHMILLER,<br><br>      Plaintiff,<br><br>      v.<br><br>SUNTUITY SOLAR, LLC,<br><br>      Defendant. | Civil Action No. 21-20412 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

  This matter comes before the Court on Defendant Suntuity Solar, LLC's ("Suntuity") Motion to Dismiss Plaintiff Abby Buchmiller's ("Buchmiller") Complaint. (ECF No. 9.) Buchmiller opposed (ECF No. 10), and Defendant replied (ECF No. 12). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants in-part and denies in-part Defendant's Motion.

**I. BACKGROUND**

  Chapter Two of the Suntuity saga opens with three counterclaims from Buchmiller, one of the former owners of Empire Solar LLC ("Empire"), against Suntuity, the lender-turned-acquirer of Empire. The Court has already recounted the facts leading to the litigation between the pair and adopts those facts here. *See Suntuity Solar, LLC v. Roseburg*, No. 21-17801, 2022 WL 2373982, at *1-2 (D.N.J. June 30, 2022), ECF No. 45. To recap, Suntuity agreed to lend millions of dollars to one of its competitors (Empire), owned and managed by Buchmiller and her sister Amanda

Roseburg ("Roseburg"). *Id.* at *1. To receive that funding, Buchmiller and Roseburg overstated Empire's finances to Suntuity to the tune of $80 million in revenues and $4 million in profits. *Id.* Once Suntuity became suspicious of Empire's true finances, it agreed to lend money to the company only if it became a manager of the company. *Id.* Suntuity and Empire executed that deal on July 9, 2021 (the "Letter Agreement"). *Id.* As a manager, Suntuity quickly learned that Empire was underwater (largely due to the owners' mismanagement) and eventually had the company file for Chapter 7 bankruptcy. *Id.* at *2.

Buchmiller's counterclaims zero in on the Letter Agreement and Suntuity's conduct as manager of Empire. To start, Buchmiller's Complaint contends that Suntuity never paid its share of the Letter Agreement. (*See* Compl. ¶¶ 58-63, ECF No. 1.) That agreement provides, as relevant here, as follows (the "Acquisition Provision"):

> **Acquisition of Membership Interests.** Suntuity, or the Suntuity Designee, shall acquire 60% of the membership interests of the Company for $3,000,000 as follows:
>
> a.   30% of the membership interests owned by Abby Buchmiller for $1.5 million, and
> b.   30% of the membership interests owned [sic] Amanda Roseburg for $1.5 million.
>
> Company's payment shall be made in 24 equal monthly installments of $125,000 ($62,500 to each Seller), starting on August 15, 2021.

2

(Def.'s Mot. Ex. A, at 2, ECF No. 9-3.)[1] According to Buchmiller, the Acquisition Provision bound Suntuity to pay for her thirty-percent membership stake in Empire over two years. (Compl. ¶¶ 30, 58-59.) Because Suntuity did not make any of its contractual payments, Buchmiller alleges that it breached the Letter Agreement. (*Id.* ¶ 64.)

She further alleges that Suntuity defamed her after it assumed control of Empire. Specifically, she alleges that Suntuity's CEO (Dan Javan) and two of its employees (Jason Nicholson and Nicole Tomasin) represented to several third parties that Buchmiller's intransigence would lead to Empire's downfall. (*Id.* ¶¶ 40-51.) First, on August 10, 2021, Javan issued a press release that stated, among other things, that Buchmiller "pushed back" on a Chapter 11 restructuring plan and "provided no viable alternative options," which "forced" Empire "to close its doors in a Chapter 7 bankruptcy protection filing." (*Id.* ¶ 48.) About a week later, Nicholson told one Empire vendor that "Suntuity would like to save Empire, but [Buchmiller] is demanding $2,000,000 to walk away and her greed is killing the deal." (*Id.* ¶ 41.) The next day, Tomasin told another pair of vendors that "Empire cannot pay you your owed commission payments because [Buchmiller] is refusing to sign the final agreement causing the acquisition to fall through." (*Id.* ¶ 44.) Finally, a few days later, both Nicholson and Tomasin told Empire vendors and employees that "[Buchmiller] took her family on an extravagant trip to Disneyland, fully paid for by [Empire] and left us no choice but to file [for] bankruptcy." (*Id.* ¶ 46.) According to Buchmiller, these

---

[1] The Court considers the Letter Agreement, attached to Defendant's Motion to Dismiss, as integral to the complaint. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) ("[A] district court may examine an 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993))); *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 412 n.2 (D.N.J. 2021) (considering contract attached to motion to dismiss as "integral to or explicitly relied upon in the complaint" (quoting *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020))).

misrepresentations caused her to lose the trust of industry vendors, miss out on professional opportunities, and receive hate mail. (*Id.* ¶¶ 49-56.)

Buchmiller's Complaint also alleges that Suntuity engaged in bad-faith conduct as manager of Empire. The Complaint asserts that "[t]he overall intention of the arrangement between [Suntuity] and [Buchmiller] had been for [Suntuity] to provide liquidity, and additional financial acumen, and [Buchmiller] to continue to operate Empire for the success [of] Empire." (*Id.* ¶ 73.) It then alleges that, contrary to that intention, Suntuity employed liquidation and defamation to strip Empire of its assets and Buchmiller of her control. (*Id.* ¶ 75; *see also id.* ¶ 76 (listing five examples of Suntuity "sidelining" Buchmiller, including that Suntuity "continually blam[ed] Empire's financial and managerial difficulty on [Buchmiller] even after Suntuity took management control over Empire and its finances" and "refus[ed] to allow [Buchmiller] to reengage in management of Empire and refus[ed] to listen to [her] ideas concerning placing Empire on sound financial footing").

Suntuity now moves to dismiss Buchmiller's three-count Complaint, contending that the Complaint fails to assert causes of action for breach of contract, defamation, and breach of the implied covenant of good faith and fair dealing. (*See generally* Def.'s Moving Br., ECF 9-1.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2)[2] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented."

---

[2] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

*Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* For example, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

### III. DISCUSSION

The Court considers each of Buchmiller's Complaint's causes of action in turn.

#### A. The Court Declines to Dismiss the Complaint's Breach-of-Contract Claim.

Suntuity first argues that the Complaint's breach-of-contract claim fails because Suntuity did not breach the Letter Agreement. According to Suntuity, nothing in the Letter Agreement obligates it to pay Buchmiller directly; rather, the Letter Agreement unambiguously provides that Suntuity must pay *Empire*. (*See* Def.'s Moving Br. 8-10.) Buchmiller resists that interpretation of the Letter Agreement, arguing that common sense mandates that Suntuity, as the purchaser, pay Buchmiller for her membership interest in Empire. (*See* Pl.'s Opp'n Br. 4-6, ECF No. 10.)

The parties' positions require the Court to interpret the Acquisition Provision of the Letter Agreement. Start with the basics: at the motion-to-dismiss stage, "the Court may dismiss a breach of contract claim for failure to state a claim if the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach. [To do so, t]he Court must first determine whether the contractual language is ambiguous." *Abramson v. Affinity Fed. Credit Union*, No. 20-13104, 2021 WL 3885325, at *5 (D.N.J. Aug. 31, 2021) (quoting *Galgano v. TD Bank, N.A.*, No. 20-5623, 2021 WL 2472331, at *3 (D.N.J. June 17, 2021)). Just because the Court may dismiss, however, does not mean it must. Indeed, "[c]ourts are better positioned to tease out ambiguities on summary judgment." *Chambers v. Chesapeake Appalachia, LLC*, 359 F. Supp. 3d 268, 281 (M.D. Pa. 2019); *see also Atlas Commc'ns Tech., Inc. v. DXC Tech. Servs., LLC*, No. 19-19033, 2020 WL 5105197, at *4 (D.N.J. Aug. 31, 2020) ("Generally, questions of contract interpretation should not be decided without the benefit of discovery and a full evidentiary record." (citation omitted)); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 164 (3d Cir. 2001) ("We have stated that before we decide whether a contract is ambiguous, we must consider the contract language, the meanings suggested by counsel, and the *extrinsic evidence offered in support of each interpretation.*" (emphasis added) (citation and internal quotation marks omitted)).

Here, as a preliminary ruling, the Court concludes that the Acquisition Provision is ambiguous enough to defeat Suntuity's motion to dismiss and to warrant additional factfinding. The core ambiguity centers on the term "Company" in the Acquisition Provision. The Letter Agreement does not define that term, so the Court must turn to the plain, ordinary meaning to decipher what entity is the "Company." *See Coba v. Ford Motor Co.*, 932 F.3d 114, 120-21 (3d Cir. 2019) (citing *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002)). The Court presumes that the drafters did not intend the term "Company" to refer to non-corporate

6

entities. Only two possible contenders then emerge for the term "Company," Suntuity and Empire, as no other corporate entity is a party to the Letter Agreement. The problem, however, is that the Acquisition Provision does not plainly refer to either option. The opening clause appears to unambiguously refer to Empire: "Suntuity, or the Suntuity Designee, shall acquire 60% of the membership interests of the Company . . . ." (Letter Agreement 2.) There, the "Company" can only logically refer to Empire as Suntuity cannot acquire itself. But that same clarity does not extend to the closing clause of the Acquisition Provision, which provides that the "Company" shall pay $62,500 to Buchmiller in twenty-four installments starting on August 15, 2021. (*Id.*) Logically, the "Company" in this clause should be Suntuity, as Suntuity was the entity purchasing Buchmiller's membership interest.

  All this to say that the Court cannot say which entity qualifies as the Company. Perhaps, as Suntuity suggests, the parties envisioned a triangular transaction whereby Suntuity paid $3 million to Empire, Empire disbursed that $3 million to its members in monthly installments, and Empire's members tendered their membership interests to Suntuity. (*See* Def.'s Reply Br. 3, ECF No. 12 ("If the [Letter] Agreement obligated any entity to make payment, it was Empire Solar Group LLC, an entirely separate entity from Suntuity.").) But nothing in the contract leaves the Court with the firm impression that the drafters intended the Acquisition Provision to operate that way or that the triangular-transaction interpretation is the "only one reasonable interpretation." *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999). Indeed, that interpretation could also very well violate New Jersey's prohibition on absurd constructions—here, a construction that would allow Empire to sell a controlling stake for virtually no upfront consideration. *See Quinn v. Quinn*, 137 A.3d 423, 429 (N.J. 2016) ("[W]hen the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as

written, unless doing so would lead to an absurd result."). Said another way, an odd result emerges if the parties intended Suntuity to pay to assume control as manager of Empire in July 2021 *but then* have Empire pay out that same consideration for control more than one month later. That interpretation is all the odder considering that Suntuity likely knew that bankruptcy was in the offing for Empire: if Empire assumed the obligation to pay Buchmiller Suntuity's consideration, that consideration could easily evaporate in bankruptcy. The more natural reading is Buchmiller's: Empire's members agreed to sell their membership interests in exchange for ongoing monthly payments from Suntuity. To be sure, the parties may have well intended the triangular transaction considering Empire's shaky financial situation and the members' thirst for funding.[3] But whatever the case may be, the plain language of the Acquisition Provision leaves the Court with more questions than answers. Discovery and extrinsic evidence are therefore necessary.

### B.   The Court Declines to Dismiss the Complaint's Defamation Claim.

Next up is the Complaint's defamation claim. As the Court recited in its June 30 Opinion, defamation requires six elements:

> (1) a defamatory statement, (2) concerning the plaintiff, (3) which was false, (4) that was communicated to someone other than the plaintiff, (5) with actual knowledge that the statement was false or with reckless disregard of the statement's truth or falsity or with negligence in failing to ascertain the truth or falsity, and (6) which caused damage.

*Cristelli v. Filomena II, Inc.*, No. 99-2862, 1999 WL 1081290, at *2 (D.N.J. Dec. 1, 1999) (citation omitted). Buchmiller's Complaint meets all six elements. It alleges that three different Suntuity employees—Javan, Nicholson, and Tomasin—made false statements to third parties that Buchmiller's actions forced Empire into bankruptcy and forced Empire's vendors to go unpaid. In

---

[3] Another possibility is that the parties made a mistake when drafting. *See Conforti v. Guliadis*, 608 A.2d 225, 230 (N.J. 1992).

one pointed example, Buchmiller's Complaint alleges that Tomasin told vendors that Buchmiller's "refus[al] to sign the final agreement" caused Empire to fail to pay those vendors' commissions. (*Id.* ¶ 44.) Another allegedly false statement by Nicholson and Tomasin informed vendors that Buchmiller's extravagant vacations forced Empire into bankruptcy. (*Id.* ¶ 46.) For good measure, the Complaint also alleges that these statements caused Buchmiller professional and personal harm—at one point alleging, for example, that "Suntuity personnel disseminated [Buchmiller's] personal cell phone number to Empire Dealers and encouraged them to verbally and electronically harass [her]." (*Id.* ¶ 50.) At this stage, these specifics are more than enough. *See Palladino ex rel. United States v. VNA of S. N.J., Inc.*, 68 F. Supp. 2d 455, 475 (D.N.J. 1999) ("[T]here are no special requirements for defamation actions under the federal rules. All that is required is a short and plain statement of the claim showing that the pleader is entitled to relief." (internal quotation marks omitted) (citing, among other sources, 5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1245 (1990)).[4]

Suntuity parries with three counterarguments, all of which fizzle out. *First*, Suntuity contends that it cannot be sued as a defamatory speaker. (Def.'s Moving Br. 10.) Suntuity abandons this argument on reply and for good reason. *See Genesis Int'l Holdings v. Northrop Grumman Corp.*, 238 F. App'x 799, 802 (3d Cir. 2007) ("Generally, an employer is liable for intentional torts, including defamation, committed by its employees within the scope of their employment." (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 47-48 (N.J. 1989))).

---

[4] Whether any of these statements are actually false is a question for another day. *See Marino v. Westfield Bd. of Educ.*, No. 16-361, 2017 WL 216691, at *7 (D.N.J. Jan. 18, 2017) ("The Court is not inclined to dismiss [p]laintiff's defamation claim at this time based on evidence offered without legal justification to contradict the allegations made on the face of the Third Amended Complaint. Such evidence is best saved for a motion for summary judgment.").

*Second*, citing New Jersey pleading standards, Suntuity contends that the Complaint is "fatally vague" by failing to allege Nicholson's and Tomasin's last names and positions within Suntuity. (Def.'s Moving Br. 10-11.)[5] But just as New Jersey's pleading rules do not apply in federal court, so too does Suntuity place too high a pleading burden on Buchmiller. *See Palladino*, 68 F. Supp. at 475; *Russelman v. ExxonMobil Corp.*, No. 12-752, 2012 WL 3038589, at *10 (D.N.J. July 25, 2012) ("According to Rule 8, a defamation pleading does not need to cite precise defamatory statements, it must only provide sufficient notice to the other party of the allegations made against him." (citing *Cristelli*, 1999 WL 1081290, at *3)). Given the substance of the alleged defamatory statements, the Court can reasonably infer that Nicholson and Tomasin were Suntuity employees that were likely responsible for its vendor relationships, including those inherited from Empire. (*See* Compl. ¶¶ 44, 46 (alleging that Nicholson and Tomasin communicated with specific vendors).)

*Finally*, Suntuity asserts that the Court should afford the litigation privilege to its CEO's statement about Buchmiller in a press release. (Def.'s Moving Br. 11-12.) The Court declines to do so. New Jersey courts have been particularly cautious not to extend the litigation privilege to "novel situations unless the underlying policy on which the privilege is based compels [that] result." *Williams v. Kenney*, 877 A.2d 277, 290 (N.J. Super. Ct. App. Div. 2005) (citing *Devlin v. Greiner*, 371 A.2d 380, 385 (N.J. Super. Ct. Law Div. 1977)). That principle has been especially true in the press arena. For example, one court noted that "[c]ommunications made to newspaper and other reports in press conferences or any other manner have been almost universally found to

---

[5] The Court hopes Suntuity sees the obvious error in its argument over last names. (*See* Compl. ¶ 5.) Although, Suntuity could be forgiven for its oversight, as Buchmiller apparently also forgot that her Complaint alleged the speakers' last names. (*See* Pl.'s Opp'n Br. 8 (conceding, without reason, that Nicholson's and Tomasin's last names are unknown).)

be excluded from the protection of absolute privilege." *DeVivo v. Ascher*, 550 A.2d 163, 168 (N.J. Super. Ct. App. Div. 1988) (listing cases). Another refused to extend the litigation privilege to an attorney's extra-judicial statements made to a newspaper in anticipation of a client's press conference because such statements were akin to "litigating in the press." *Williams*, 877 A.2d at 290-91 (citation omitted). The Court applies the precepts of these cases and refuses to extend the privilege to an extra-judicial press conference. To be sure, Suntuity cites no underlying policy served by applying the litigation privilege here. *See Cooper Health Sys. v. Virtua Health, Inc.*, No. 09-735, 2009 WL 10727975, at *5 (D.N.J. July 16, 2009) ("[The litigation] privilege—predicated on the need for unfettered expression critical to courts' administration of justice—applies only to statements made in judicial and other formal proceedings, not in public press releases.").

        **C.**    **The Court Dismisses the Complaint's Breach-of-Covenant Claim.**

The Court finally addresses the Complaint's breach-of-covenant claim. In New Jersey, "every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract's terms." *Abramson*, 2021 WL 3885325, at *6. To assert a breach-of-covenant claim, a party "must allege that the accused acted in bad faith or engaged in 'some other form of inequitable conduct in the performance of a contractual obligation.'" *Intervet, Inc. v. Mileutis, Ltd.*, No. 15-1371, 2016 WL 740267, at *4 (D.N.J. Feb. 24, 2016) (quoting *Pactiv Corp. v. Perk-Up, Inc.*, No. 08-5072, 2009 WL 2568105, at *12 (D.N.J. Aug. 18, 2009)). Thus, at least two ingredients for a breach-of-covenant claim emerge: bad-faith conduct and frustration of some contractual obligation.

Suntuity asserts that Buchmiller's Complaint fails to allege both prongs. (Def.'s Moving Br. 12-13.) The Court agrees but only in-part. It does not agree that Buchmiller's Complaint fails to allege bad-faith conduct. To the contrary, the Complaint is replete with examples of that conduct, including that Suntuity "systematically shut[] [Buchmiller] out of all management

decision[s] and meetings," that a Suntuity-instructed third party "push[ed] [Buchmiller] out of management decisions and meetings," and that Suntuity "refus[ed] to listen to [Buchmiller's] ideas concerning placing Empire on sound financial footing." (Compl. ¶ 76; *see, e.g., Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010) (providing examples of how "evasions and subterfuges on the part of the defendant can suffice to establish" a breach-of-covenant claim).) At this stage, these allegations are enough to allege that Suntuity engaged in bad-faith conduct that deprived Buchmiller of her benefit of the bargain.

The problem for Buchmiller, however, is that the Complaint nowhere alleges what contractual obligation gave rise to that benefit of the bargain. In other words, Buchmiller must allege *some* contractual provision or purpose that obligated Suntuity to, say, seek her counsel or otherwise involve her in management decisions. Without these critical allegations that link an underlying contract to Suntuity's alleged bad-faith conduct, the implied covenant morphs into what the New Jersey Supreme Court has warned against: "an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 231 (N.J. 2005). Buchmiller's Complaint does not allege any contractual obligation that Suntuity frustrated. It instead vaguely alleges that the "overall intention of the arrangement" between the contracting parties was for Buchmiller "to continue to operate Empire for the success [of] Empire." (Compl. ¶ 73.) The Court cannot glean with any certainty what the overall intention of the arrangement was, much less *where* in the parties' course of dealings that intent was present. Indeed, based on the terms of the Letter Agreement alone, the intent appears to be contrary to the Complaint's presentments—faced with financial difficulties, Buchmiller agreed to hand control of Empire over to Suntuity. Why Suntuity

12

would then also agree to allow a minority member to influence its financial decisions is therefore not readily apparent. *See Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001) ("[C]ontract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper." (citation omitted)).[6]

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[6] Because the Court will grant Buchmiller limited leave to amend this claim, any amended complaint should allege what contractual obligation Suntuity frustrated and what facts gave rise to that obligation. *See Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 35 (3d Cir. 2011) ("Although [the plaintiff] may have had a credit card contract with [the defendant], he has not alleged facts that would support a conclusion that he was deprived of the benefit of the bargain under the contract." (citing *Seidenberg v. Summit Bank*, 791 A.2d 1068, 1077 (N.J. Super. Ct. App. Div. 2002))).